We want to welcome everyone to the Fourth Circuit Court of Appeals this morning. We have just two cases with good lawyers and interesting disputes. In the first case called Virtuous, I think, v. Sophos, Mr. Lamkin. Good to have you with us, Mr. Lamkin. Thank you. Good morning, and may it please the Court. To give Invencia global peace, the settlement agreement gave Invencia the right to practice all of Virtuosa's technologies, existing patents, future patents, not just particular technologies or features. The agreement similarly defines the covered Invencia sales not by technology, not by feature, but by product name, listing products that have a range of technologies. And then it then provides that Invencia is to pay royalties on natural evolutions and derivations of those names. Is Invencia a party to this appeal? Yes, Your Honor. Invencia and Sophos are both parties to that appeal. I know there were parties below, but I thought they weren't a party to this appeal. I believe they are, Your Honor, and they are bound by the, it still exists as a company, they are bound by the agreement, and they are disputing. Who is the counterclaim involved? The counterclaim is Sophos' counterclaim that there was a failure to, I believe at Sophos, that there was a failure to provide a consent to transfer a license for Sandboxy. I thought the counterclaim involved Invencia and, but the counterclaim is not before us. That's correct. This is under Rule 54B where judgment was entered against. And what about that certification? What's the, you know, we have an obligation to look at the jurisdiction on our own. That's correct. And determine whether these certifications under 54B or whatever are proper and whether we really have jurisdiction here. Yes, then the district court made all the findings necessary to say that there was no just reason for delay to allow fewer than all of the claims to come forward. And that was all tied to the counterclaim. Pardon? I thought that was tied to the counterclaim, no just reason for delay. Well, there's no just reason for delay for this to be appealed immediately, to allow us to resolve this on the court before getting to the counterclaim. Was it a final order? Yeah, it was final as to our claim for breach of contract. But it was final as to one claim against one party or two parties? I believe it was fewer than all claims and I believe it was as to two parties, but I'm not certain. But it is fewer than all claims for certain. And there was a discussion somewhere in the papers that there are five claims. Well, certainly all of our claims were dismissed. All of our claims were summary judgment was what's up on appeal. And the district court found that there was no just reason for delay for multiple reasons. One is the claims and counterclaims are entirely distinct. They're about different events. And so there's no chance of one mooting the other in this court having to review. We normally just review final orders. That's correct. And that's the whole case. Right. But the Rule 54B is an exception to that and it's subject to an appeal. But we have to review that also to see whether it's the court views discretion in issuing the certification order. That's correct. And neither of you briefed that. You just automatically said there's 1291 jurisdiction here and you went on with your brief. Nobody briefed the jurisdiction question. No, that was not briefed separately, Your Honor. And my apologies if we should. But the district court on J. 227, 228, 229 went thoroughly through why there was no just reason for delay and went through each of the factors that this court requires for Rule 54B certification. And I don't think there could be an abuse of discretion here, given that the one claim... Well, why don't you tell us exactly what you think the issues are on appeal? Yeah. I think that there is one issue that is on appeal, which is the district court decided that in the contract there was an implicit limitation for derivations, that it was limited to containerization technology, whatever that term means. It's not actually in the contract. And it therefore granted summary judgment on the basis that there was a containerization technology limit for derivations. That's the issue that's before the court. The court could address other issues. There are other rationales that are argued by... Well, if we decide... Let's move into that one. Okay. If we decide that issue, is the whole case ended? So we believe we're entitled to summary judgment. That would end liability. We'd have to go to damages at that point. All right. But the court could also... Wait a minute. What happens if we affirm the district court? Is all the case ended then? No. The counterclaim, which is the reason we needed a 54B, is that there is a counterclaim, a separate issue. This is a final judgment as to fewer than all claims, which is why we require the Rule 54B certification. There would still be a counterclaim to address on remand. But the district court was concerned, among other things, that if this weren't squared away finally before going to the counterclaim, it might have to run two trials on the counterclaim. Because if this court disagreed with its analysis, disagreed with its analysis of the meaning of the contract, one of our defenses to the counterclaim would spring back to life. And it might have to run two trials. What exactly is the counterclaim that you say would be available on remand? So the counterclaim was that we, Virtuous, failed to license a transfer, authorize a licenses from either Invinci or Sophos to another company for a product called Sandboxy licenses. And the argument is that we wrongfully failed to do that. But that is an entirely different set of circumstances with whether or not, what is the scope of the royalty obligation here? But if we were to decide to affirm the district court, the counterclaim would go forward? That is correct, Your Honor. Okay. And if the court reversed, the counterclaim would go forward as well, but we would have an additional defense to it. And that's why the district court was concerned that it would end up with two trials in the event that if this were not resolved completely and finally. So you just said that you'd be entitled to summary judgment. I want to ask a hypo that I don't think your briefs give me a clear answer to. So imagine that Ikea has a bookcase that uses a certain kind of screw. It's like a really specific Ikea kind of screw. And then at some point later, Ikea is developing a nightstand and they use that screw in making the nightstand. Those are the only facts in the record. Based on those facts, is the nightstand a derivation of the bookcase? Yeah, I think it would be, Your Honor. Really? Because my instinct is heck no. So certainly the normal is there's sort of a substantiality requirement when you're talking about when something's a derivative. Does it matter if the screw was made for, because I didn't tell you this fact. Does it matter that the screw is a preexisting Ikea screw that they actually made before the bookcase? Okay. So that would change the answer because there's an inherent substantiality requirement in the term derivation. So that excludes things that are not original with, that are essentially generic, that are just trivial to the original product. And what, if I'm looking for, so your brief says over and over again that this particular code is in both products. And it says that, it says this code is in both products. It says product one predates product two. I think the record clearly substantiates there's code that's common and product one predates product two. And it seems to me that your brief says that means product two is a derivation of product one. Except for me, I need to know, does this code predate product one? And what is your best evidence in the record that the code doesn't predate product one? That it was originated with product one? I don't think anyone has disputed that it came from, that it was. No, no, no. Your brief's really careful. You say over and over again, it's the same code. And you say over and over again, product one comes before product two. I don't see where the record says we know that the code doesn't come from something pre-product one. So, your honor, I believe that if this is something that is unique, that you can actually identify it, it's not essentially generic, then it is a derivation, even if it borrowed from one. So if you have three versions of a textbook, version three of the textbook is a derivation of version two. Sure, of course, version three of the textbook. But I'm talking, again, there's two hypotheticals. One possibility is that when they created the bookcase, they just went to an Ikea screw drawer and grabbed a screw from the Ikea screw drawer. In which case, I think it's obviously not the case that the nightstand is a derivation of the bookcase. Another possibility is that they made the screw for the bookcase and then they used it. And I'm asking you a factual question about this case. Where in the record does it establish that it's not the screw drawer hypo, but that it's the second hypo? So I'm trying to point to two places. The first would be on 901 and 922. And these are affidavits from Mr. Ira Heffen. And Mr. Heffen explains that Sandstorm incorporates source code from Invincia X endpoint. From Invincia X endpoint. And at 922- That's different from saying originated with. Yeah, so whether or not it's original to that shouldn't make a difference as long as it is identifiable or recognizable and not essentially generic. Okay, I cut you off. What's the second one? And the second one is that Sandstorm no longer incorporates source code from Invincia X spearfish protection. So it originates as a matter of lineage from spearfish protection. But even- You think as a matter of law, that's what those statements mean? I do think that's what they mean. But certainly, you couldn't enter a summary judgment against us, which is- Right, this was a question about whether you can get summary judges for you. And at the very least, this is an ambiguous agreement. That would mean that under Virginia law and under the law of this circuit, you would have to go back to the jury to resolve any ambiguity. So can I ask you about another thing that- So I read your brief, and you basically say the district court is wrong because natural is not distributed. The distribution argument, natural, right? Okay, so I get that argument. It seems very plausible. I'm going to ask the other side some questions about that. I wrote an opinion recently that said appellants don't get to whipsaw district court judges. Where in the world did you ever argue that to judge? It's like a real important argument you're making on appeal, this distribution term of art. Where did you ever say that to judge Walker, ever? That natural evolutions and derivations, the argument that is a pretty major argument you make on appeal. Judge Walker says that natural goes to derivations. And you say, well, he's totally wrong because natural evolutions is a term of art and natural derivations isn't. Where did you make that argument to the district court? I'm not sure that was- because the district court sort of- and everybody flipped them around a lot. I'm not sure that was specifically raised, but that was passed upon by the court below. And if the court's wrong- I'm just envisioning writing- I'm envisioning writing an opinion, reversing the district court judge in this case by saying, why did you possibly not realize that this is a term of art? You're obviously wrong. It's a term of art. And then I could imagine the district court judge going, no one ever made that argument in front of me. But the judge made that ruling. And having made that ruling, it is reviewable it's wrong. But even setting aside that, in terms of what the meaning of the word natural is and what it covers, it really doesn't matter if it covers both. Because I don't think I've ever seen an argument that a derivation is unnatural if it borrows machine learning code from malware prevention and uses it for machine learning in another malware prevention product. That's not as natural as- What about the impact of our prior decision in this case, where we said this is about- the contract was about containerization products. It wasn't about this machine learning part that could be part of it. Why wouldn't that say that the derivations in evolution go only to the containerization products? How does the machine learning part ever get into this? Yeah. Because the definition, as this court said, the definition of containerization products, container products, is self-defining. The container products definition states which products are the accused container products. So we're focused in on products. What is a container product? And then once you have that product, it has a range of technologies in it. Then the derivation provision says if you have a derivation of that product, not a technology for that product, not accused technologies, not derivations or container derivations, just derivations, and that means it's derivations regardless of technology. An example, for example, if one- So how do you get that from the prior decision? Well, certainly prior decision doesn't tell you what derivations are or what the scope of derivations is. But the prior decision- But it does, under law of the case, frame everything that's supposed to happen in the case afterwards, right? Absolutely. And I think it actually is quite favorable to that in that respect in that it tells you that the products are defined by name, these products. And so once you have the products, those have a range of technologies. And if you have a derivation, it doesn't say a container derivation, it doesn't say a derivation of a technology, it just says derivations. And that's actually quite natural because we were giving them a license for all of our technologies regardless of technology. And ever since the Supreme Court's decision in automatic radio, it's been quite common to have something that says you have a per license payment, whether you use all the technology, some of the technology, or none of the technology. I see my red light is on. If the court has no further questions, I'll reserve the range of time for about- Are you finished? Yeah. Thank you. Thank you very much. Mr. Martin. Good morning, your honors, and may it please the court. I'd like to start with the jurisdictional question that you were asking. I would note that if the court resolves this case favorably for Sophos by affirming the decision below, then Sophos as a party will be entirely out of the case. So it's not just a question of getting rid of certain claims. An entire party will be removed. And so we think that supports this court's- What's the other party? Investia? Invincia, your honor. I mean, I can't pronounce it right, but- Right. So there's a counterclaim. Is it a party to this appeal? It is nominally a party, but this- Nominally a party? How do you have a nominal party in an interlocutory, or I call it interlocutory, in a 54B appeal? Yeah. I mean, it is a party- The counterclaim is being pursued by- By Invincia only, not by Sophos. That's Invincia's counterclaim. There were claims against both Invincia and Sophos. Is that significant to this jurisdictional issue? We don't believe so. We agree with everything that Mr. Lampkin said. How do you have five claims in here? The judge talked about five claims in this case. Well, yeah, there were- How are there- There are two claims in the complaint. Yeah, I'll- And there's a counterclaim. Yeah, I believe there might only be three, Your Honor, as I count it. But I confess I did not look at the claims before coming in this morning. We can follow up with a letter if that would assist the court on this issue. I just noticed that. Maybe the two parties, they're separate enough that only one of them's here on this appeal, I guess. But one owns the other. Yes, and that leads to one of our arguments that we have in the alternative, which is that the Sophos products, these specific products are not covered because they are products of an acquiring party. And as Virtuous has argued, Sophos is a successor and interest to Invincia for purposes of the agreement. Therefore, these specific products are carved out. That's an alternative argument. You represent both Sophos and Invincia. That is correct, Your Honor. Okay. We did below. Their claims of breach with respect to the Invincia products were settled out. It was a very small dollar amount. We got rid of those claims. So all that's left in the case are their claims that royalties are owed by Sophos for the Sophos products and then Invincia's counterclaim for breach, which Mr. Lamkin describes, for Your Honors. And this result here, this way you have them on appeal, would have an impact on a counterclaim? It would have an impact on the counterclaim to the extent they have an argument. They have a defense to the counterclaim, which is under the First Material Breach Doctrine. This was actually all briefed the last time we were before, Your Honors. So if they no longer have a claim of breach because we've settled out their claim with respect to the Invincia products and you affirm the district court with respect to the Sophos products, that has an impact on what occurs with the counterclaim. Assuming it even goes forward, there's always a possibility the parties will settle that out as well. But I think one of the important points for jurisdictional purposes is that an entire party, Sophos, will be out of the case if you resolve this because Sophos is not itself advancing the counterclaim. That's on behalf of Invincia as a corporate entity. Turning, Your Honors, if you're satisfied. One more. Sophos and Invincia are not brother, sister, parent, sub? They are parent, sub. Sophos bought 100% of the stock of Invincia. So turning to the claims with respect to the Sophos products, I would like to start by recentering the court on two facts because the factual record got somewhat muddied in the course of the briefing here. First, to quote from an undisputed statement of material fact, Sinomix, which is the only source code file that was added to the Sophos products, Sinomix does not implement or use a container technology in any way. And to quote from a second statement of undisputed material fact. The Sophos products were pre-existing to deal with Invincia. Correct. They were pre-existing Sophos products. Sophos bought Invincia and then added the Invincia machine learning source code, which has nothing to do with the implementation of containment, to the pre-existing Sophos products. The second statement of undisputed material fact I'd like to emphasize that they agree to is that Sophos has not integrated any of Invincia's container technology into any Sophos product. So I want to get to Judge Heighten's question about, is the software generic in some way? I think it's very important to know. Well, I wouldn't say it's generic. I would just say it's about what a derivation is. Well, right. And I think going to that point, the Sinomix source code was, in a sense, generic to x by Invincia. It was not something which only appeared in spearfish protection in the accused container products. It was also in detect and prevent, which this court ruled on the last appeal were not accused container products. And just so for purposes of the record, this is summary judgment. I have no reason to believe that what you just said isn't true. But where in the record would I find that, that this source code was in a whole bunch of other products too? I think that was so uncontroversial. OK, that's fine. I don't understand it to be disputed. OK. So what is the evidentiary record about where they got Sinomix? What draw did they go to to get this? And they is Sophos. Sophos. So when Sophos purchases Invincia, they want to adopt Sinomix. Where do they go? There was actually discovery on this question. Witnesses were, a witness was deposed. And he was asked, where did you get this file? Which product did you take it from? And his answer, this is at JA 678 to 680 in the record, was we didn't actually take it from a product. That wasn't the mechanism we used. We took it from Josh's team. So there were some follow-up questions. Well, where was the source code that implemented it in Invincia's source code repository? I don't know the answer to that. Would Matt Steck know? And the questioning petered off. There was never a deposition of Matt Steck. So they have the burden of proof. If their theory is that the Sophos products are container products and services, that they're derivations, because the file was taken from Spearfish Protection, they had the obligation in discovery to figure out exactly where this came from. And they did not. Now, they point to these declarations from Mr. Heffen. So did the Spearfish product have all the underlying code in it, both container and machine learning? The code was distributed with the product. And this is an important point. And this is, again, undisputed between the parties and their experts. When companies want to distribute, when companies have many products, one thing they may do is just distribute all of the source code to a customer when they buy one product. But they will use feature flags and license files to disable functionality that the customer didn't pay for. And so what they say in their own brief, this is at their blue brief at 5 to 6, to streamline product development, distribution, maintenance, companies often use the same source code for multiple products. And then they go on to explain in their opening brief how these license files are used to distinguish between products, even if the same source code is there. And if you look at the party's experts- So the seller doesn't want the purchaser to use X, Y, and Z. They just disable it. Right. You only pay for Spearfish. And so you're not getting this other technology, even though we're sending the file out. So that if in the future you decide you do want to pay for that additional functionality, we don't have to send you more source code. We're just going to send you a activation code. And then you punch in the activation code. And now the new functionality gets implemented. This was also discussed by the party's experts at 458 and 588. But going back to the declarations that my friend referenced from Mr. Heffen, those declarations were issued after Judge Morgan's original decision in which Judge Morgan said at JA105 to 107 that the source code was from Spearfish Protection. So Judge Morgan issues a summary judgment decision against us, says this is from Spearfish Protection, requires us to put out reports explaining what royalties are owed. And so in our new royalty reports that were required to put out in response to a decision which was later reversed by this court, we used the court's terminology. That was certainly not a statement that engineers went and took this file from Spearfish Protection in particular. There was, as I was describing before, specific discovery about that. And the witnesses all made clear that it didn't actually come from Spearfish Protection. It might have come from a repository. And there was no follow-up by the plaintiff to figure out exactly where it came from. Now, that only matters, of course, if you agree with them on what the plain and ordinary meaning of derivations is. And if you agree with them that the word container, which appears twice in the relevant discussion of what is a royalty-bearing product, is pure surplusage. And so we think as you look at the plain and ordinary meaning of derivation, particularly as paired with natural, and as you look at the typical canons of contractual interpretation, including the canon which says you don't treat words as surplusage if meaning can be given to them, that their interpretation of the contract should be rejected and the district court's interpretation should be affirmed. A product is only a natural evolution and derivation of the accused container products in a definition of container products and services in a license that was entered to end patent litigation over two patents to container technology which are identified on the face of the license if it itself has container technology. That is the essential feature of the four identified products. And it would make no sense to say that, to take the screw case, for example, that a product is a natural evolution and derivation of an earlier product if it only has some part that may not even have been enabled in that earlier product, which is another point I want to get to here, which is that, again, their theory, as it has evolved somewhat on appeal, is that synomics was important to spearfish protection, that it was enabled in spearfish protection. But how is this possibly a basis that you can defend summary judgment in your favor when you all don't agree on this question? Because they're raising this for the first time on appeal. This is not something they argued to the district court. Before the district court, they argued that enablement had nothing to do with the interpretation of this contract. They argued this to the district court at Joint Appendix 1001, 1016, and 1049. Their expert said below that he couldn't even tell if synomics was enabled in spearfish protection. He didn't even look at it. This is his testimony on examination at JA 648 to 652. He repeatedly said, I don't know if it's enabled. So their entire position below was that it didn't matter if it was enabled because there was no relevance. And both sides have experts here, right? Both sides have experts. And our expert, their expert said, I don't know, even though they're the party with the our expert affirmatively testified that it was not enabled. That was at JA 538. So if their theory is that this should be royalty bearing because synomics was an important file to spearfish protection, was somehow involved with enabling containment, that is not what they argued to the district court. They're arguing that for the first time on appeal. And so that's that. So to your question, Judge Heitens, that's one reason why. But what is your response to the argument that's very prominent in their briefs is like what we're doing here is literally what the settlement was designed to avoid, which is fights about what is actually derived from water, how you prove what, like the whole point is these two, the meta theme of their brief is basically these parties hated and distrusted each other. And they entered into a global peace that said, you get to use all their patents. And in exchange, you have to pay them for them. And we're not going to have these little fights about what derives. Like, so, you know, the argument, right? I think that actually, that actually cuts our way because the parties knew how to talk in technology agnostic terms when they wanted to. The license covers everything. Now, let's talk about what's going to be royalty bearing. When it came time to define what would be royalty bearing products, they didn't say royalty bearing products and services. They didn't say licensed products and services. They very carefully said container products and services, which are these four accused container products. So by negative implication, there must be licensed products that are not royalty bearing. It's certainly contemplated, right? Well, otherwise, it's a bizarre way to write the agreement. Right. They could have used broader neutral terms if they did not want every licensed product to be royalty bearing. There actually is a definition of licensed products and services in there. But as you parse it, it also refers to container products and services because it uses the defined capital S sold. And sold is limited to container products and services. So everything traces back at the end of the day to container products and services. What's the impact if there is any of our prior decision that was limited just to the container products? So we read your prior decision, not as controlling this case. But I think if I can get, I hesitate to put myself in judge's minds. But as I read the decision, I think you understood that this is not a license about individual source code files, right? You pointed out in your decision, this is not even mentioned source code files. It's an agreement about products. And what products are mentioned, it's four products that the parties agreed were container products. That is the only common feature of those products that is called out twice on the face of the license agreement. The parties wanted to be very clear, it's container products that are going to be licensed bearing here. And so the idea that you would take a source code file, which may not even have been enabled in the container products and services and hang your hat for royalties on that, puts source code front and center in a way that this court previously recognized the agreement does not do. If the parties wanted royalties to be tied to individual source code files, it would have been very easy for them to say that. They could have written the agreement so that there would be a definition of royalty bearing products and services, which is defined as Spearfish Protection and any future product that has a source code file from Spearfish Protection. That is not what they said. It's evolutions and derivations of the four container products in a definition which is labeled container products and services. Have you identified any license agreement that refers to natural derivations? We have not, Your Honor, nor have we found a license. We looked. We couldn't find anything. I imagine you had. Which said natural evolutions and derivations. That seems to be a phrase that was created for purposes of this license agreement. I will say, if you look at the definition as a whole, right, so it's the accused container products, four products are named, then it's evolutions, right? Let's skip over the word natural for a second. So that's the full phrase, natural derivations and evolutions. That's, to your knowledge, not a term of art in this field. Correct. You sometimes see natural evolutions, but it's not that it's, there was no testimony below about natural evolutions being a defined term. And as I, as I myself look. No case that you're aware of has ever defined this phrase as being a term of art. Not that I'm aware of, Your Honor. I don't rule it out, but I don't believe I've seen one. For evolutions, their expert at JA 479 describes evolutions, and we're happy with this description of what an evolution is, as a product which has minor changes over time as source code gets tightened and minor improvements are made. And so the way we read, and they have essentially admitted, they've never argued that evolutions would cover non-container products. If you look at their reply brief at page 15, they say that evolutions would cover subsequent generations of spearfish products. So I think the way they read the agreement is that it's four container products, evolutions, which are container products, and then derivations, which are any products that have any source code file whatsoever, even if it has nothing to do with containment and may not have been enabled even in spearfish protection. That puts derivations in the, in the driver's seat. It essentially covers everything. Evolutions becomes almost irrelevant because anything that would be an evolution would certainly have at least some source code in common with spearfish protection. And so we think they're reading derivations far too broadly. It's not a reading, which is supported by the plain and ordinary meaning of the word. We, in terms of usage, walked through in our brief both dictionary definitions, and then we went out and found, we tried to find every case we could find that used the word derivations with respect to products. And so we list in our brief a number of cases in which either courts or litigants are using the word derivations to describe products. And when they do, they're not talking about just taking any random part and sticking it in something else. I'm partial to the Yankee Doodle example we have in our brief. Something doesn't become a derivation of something else just because you put a part in it. But when, when courts and lawyers use the word derivations with respect to products, they're talking about products which are improvements on the original product or modifications, revisions or new models. But, but why aren't those evolutions? I would think like, for example, what's the relationship, this is going to date me, but what's the relationship between Windows 95 and Windows NT and like, I would say those are evolutions. So that, that literally came up whenever I moved courts, your honor, that, that example. It's just because you have other old people at your moot court. So the way that, the way that we see the difference between evolutions and derivations, evolutions are more minor changes. They're, they're tightening the code. It would be, you know, instead of Spearfish 5.0, Spearfish 5.1, whereas a derivation might be something more dramatic. If, if Sophos, for example, had taken all of the container source code out of Spearfish and then created some new Sophos container product. We're getting dangerously into my knowledge of Ikea here, but what if, to add my hypo, that we have a nightstand and a bookcase that are both called Billy? Would you say that the Billy nightstand is a derivation or an evolution of the Billy bookcase? I would say it's neither because one is a bookcase and one is a nightstand. Even though Ikea literally calls them both the same thing and they look, and I'll just represent, they also like, you can see they were designed by the same person. They're designed to look good together. They're designed to go in the same room together. So furniture companies do do that. In my dining room, we have a table, which is of a certain brand and the matching China cabinet. They both are called, I can't remember the name of it, but it's, so you'd say that's neither an evolution nor a derivation. I don't think it's an error. Yeah. If you, if you just, if you're just taking the name in common, but they're different products, then one's neither an evolution. No, it's not just the name in common. Again, they're very clearly designed to go together. They're clearly designed to look alike. Who knows? The shelves are probably the same type of wood in the same shape of wood. Right. No, I, I still don't think one's a evolution or derivation of another. They may have, they may have a common Genesis in someone's view of what, what about the relationship between the iPhone and the iPod? Um, yeah, I don't, I don't know how much is in common between those two. Your honor. I apologize. Uh, I do want to go to the, the, some of the examples that are given by the U.S. Supreme court and by the Virginia Supreme court about how to read lists in a situation like this, how to read one, how to read lists in a situation like this. How long would it take to try this case? Did y'all ever discuss that? Uh, I don't know how long it would take to try it. Did y'all ever discuss that with the district court? Uh, I don't know. I was on the trial team, but I was not involved. You were not involved in that part. Yeah. I mean, if it's just the counterclaim, I mean. I'm talking about everything. Oh, every package. Yeah. It would, it would take a while. This, this case has been going through the counterclaim in that question. Yeah. This case was filed in 2018. So I think everyone, at least on our side, were eager to put it to bed. Uh, I don't, I don't know how long it would take your honor. I, I've been on patent trials that have taken a week. And so you got good lawyers on both sides and good arguments on both sides and a lot of disagreements. We don't think there were disagreements as to material facts. We think if you look at what that's, that's, that's why you're here, summary judgment. Yeah. But if we were determined, there are disputes of material facts. If there are, if you, how long would it take to try the case? Um, if I had to guess, it would probably take about a week or so. A week or so. Um, if there were no further questions. Thank you, your honors. Thanks very much. Good to have you with us. Mr. Lampton. Thank you. The district court's decision rested on its understanding of the word natural evolutions and derivations. And that somehow that implicitly limited it to things that have containerization technology. But if there were an effort to limit it to containerization technology, there might be a definition of that. We don't have and have a definition of that. If they meant to limit it to containerization technology, it wouldn't have been the accused products. It would have been accused technology. And when it's a derivation, Wait, hold on. Doesn't it say accused container products? It says accused container. I'm just saying you just cut in a, you just tried to like, oh my gosh, how could anyone possibly think it's about container products? They literally said accused container products. Well, I should reframe it then, Judge Hayden. Accused container technologies or accused container features versus accused container products. And then it takes products and it says derivations of those products, which means something taken from or derived from those. It doesn't say... So how does that argument help you? Because the accused technologies, the accused products have a range of technologies in them. They have containerization. They have machine learning. They have sometimes something called behavioral management. They have a lot of technologies in them. And rather than parsing through the different technologies and saying, well, we're going to like, they're going to have royalties on this technology or that technology. They did it on the basis of the product. If you are this product, you're an evolution, you fix some bugs, you're a version two with a slight update or you're a derivation. We took some of that original product and we moved it to another product. So what, if anything, do you think Sophos could do with Sinomix that you would not think creates a derivation? Is there anything? Well, I think the word... Is the rule you're actually advocating for any product that has this code in it is a derivation? Well, certainly if that code is... Because that just seems to resurrect what Judge Morgan said in the first instance that we reversed him for saying. Like now we're saying, like Judge Morgan said in the first case, because they share code, that's it, you win. And we said, that's wrong. But now you seem to be trying to resurrect that exact same rule by saying, if it has that code, we win. Well, your original rule was that it doesn't count automatically as one of the named products. Simply because that's the same code. No, but as a practical matter, it would mean a reversal in case one meant nothing at all. Well, no, it meant that your remand actually meant something. Because you remanded, it did not reach whether or not, for example, prevent and detect were derivations. You specifically held out and said, you know, those may be derivations anyway. And when the district court found a disputed fact on that, and then maybe I should come to that very briefly when it talks to what was enabled, they settled. They didn't settle. They just paid up. So that brings me, I guess, to what with the argument about what is enabled and what is not. Yeah, or can you just answer that? I think this might be part of your answer, but I have a broader question, which is like, I know your primary argument is that we should get summary judgment, but your secondary argument is no one should get summary judgment. I think that's right. So let's take the second argument for a second. So assume for the sake of argument that we're in here, you're arguing that they shouldn't get summary judgment, right? So what material fact is in genuine dispute? Well, first, your honor, at worst, the notion of what is a derivation and whether the synomics is sufficiently substantial to count as a derivation. Well, the meaning of derivation is not a jury question. That's a question of law for the court under Virginia law, right? Ah, except when it's ambiguous, your honor. Once there's ambiguity, then it goes to the trier of fact. This court pointed out in its opinion, and the district court below pointed it out. When you have something that is subject to two reasonable interpretations, then it becomes a factual fact. Sorry, even after, so is the thing Virginia says is we look at the text, but if the text is like a little bit ambiguous, we look to parole evidence. That's still the court. And if it's still ambiguous, we then go to a jury. Is that? Yeah, I think if we can't come up and decide that there's one reasonable construction, then it goes to the jury. Now, being very textually oriented, the Virginia courts very often find a single meaning. But likewise, here being textually oriented, we have the word derivation, but it doesn't say container derivation. We have the word container products, and it's based on what's in the products and if you derive from those products. So I think that even when it comes to the meaning. Let's assume that I don't really think that that's a fact. What fact do you contend is in dispute? Well, okay. So for example, the issue of enablement, what was enabled in the prior products is a dispute. We actually don't think that's material. We think it automatically goes our way. Right. So I'm asking you, what is material? What's a material fact that's in dispute, you think? That would actually go against us? I don't think there is one. Well, so your real argument then is that we get summary judgment. Your backup argument is not a real argument then. Well, I know it is a real argument, Your Honor. But if it's a real argument, you have to tell me what material fact you would... We're to write an opinion saying the district court was wrong to grant summary judgment to anyone because the following material fact is in dispute. What is that material fact? This court would confine itself to what the court actually ruled on. And the court would say... The court said there was a singular unambiguous meaning of derivation, which means it has to have container technology. We disagree. What the parties meant is unclear. We're going to have to have a... But that's just it. The meaning of the agreement. You don't contend there's like a fact in the world. For example, Judge Haytens, you brought up whether or not where this actually came from. They say it came from a group of... The technology came through a library system. And you said that probably doesn't make a difference as long as it originated from, like it got into the library from the original product, from one of the named products. That's something that we might be able to try. But at the end of the day, one thing that is clear is... Go back. Tell me why that's a material fact in dispute that bars summary judgment. Right. If there's a derivation... Derivation means that it originates, you borrowed something from another product. If they were able to show that this synomics was borrowed from a different product, it wasn't borrowed from Spearfish, it wasn't borrowed from Advanced Endpoint Protection, it didn't derive from any of them, it came from some other third source, that might be a triable issue of fact. We have to show it was derived, which is a matter of lineage, not identity. So it might be or it is. Pardon? It might be a material fact. Or it is a material fact. If they have the evidence, it would be a material fact. I don't think they have... Wait, who's the plaintiff in this case? We are. Why do they need evidence? Because we have enough evidence to get to the jury, and they'd have to have evidence that's so overwhelming that it doesn't get to the jury. The discovery's been completed, right? Discovery's completed. It would be a matter of taking this to trial. But I'd like to just point to one analogy which sort of brings out the problem with that argument. If there were, for example, a license for derivations of a Wizard of Oz, no one would look at that and say, well, just because you only use the Tin Man in Toto, it's not a derivation. It would still be a derivation because you took two distinctive and identifiable characters from the original. And that would be true even if the original dispute were about a product. Hold on, hold on, hold on. That's like saying that because Aslan is a Jesus-like figure in the Chronicles of Narnia, anyone who creates a later work that has a Jesus figure is derivation of the Lion, the Witch, and the Wardrobe. In contrast, that both of them are derivations of the New Testament. No, no. I think that takes it too far. It has to be something that is distinctive and identifiable. It wouldn't be every book that has a girl and dog. It wouldn't be every book that has a fake wizard. It wouldn't be every book that has a pair of red shoes. Something that originates with the Wizard of Oz, right? Which comes right back to my belief that maybe it's really, really important to know where did this code originate? And certainly you could ask that question. But I think if you're borrowing something that's distinctive and identifiable and not merely generic, it is under derivation. I see my red light is on. If there are no further questions, we ask the court to reverse and thank the court for its time and attention. Thank you very much. We appreciate the arguments. We will come down and greet counsel and then we'll take a short break. This honorable court will take a brief recess.
judges: Robert B. King, G. Steven Agee, Toby J. Heytens